FILED

2013 Sep-26  PM 12:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | |
|---|---|
| **MICHAEL D. JOHNSON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Civil Action No.: 5:11-cv-3493-RDP** |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of the Social** | ) |
| **Security Administration,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION

Plaintiff Michael Johnson ("Plaintiff") brings this action pursuant to Title II of Section 205(g) and Title XVI of Section 1631(c)(3) of the Social Security Act (the "Act"), seeking review of the decision by the Commissioner of the Social Security Administration[1] ("Commissioner") denying his claims for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI"). *See also* 42 U.S.C. §§ 405(g), 1383(c). After careful review, the court finds that the decision of the Commissioner is due to be affirmed.

## I.    Proceedings Below

Plaintiff applied for DIB and SSI on June 16, 2008 alleging disability beginning June 1, 2006. [R. 88-96]. The Social Security Administration denied Plaintiff's claims on September 2, 2008. [R. 52-54]. Plaintiff requested [R. 60-61] and received a hearing before and administrative law judge ("ALJ"). The ALJ held a hearing on February 1, 2010. [R. 5-21]. The ALJ issued a decision on

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Therefore, she should be substituted for Commissioner Michael J. Astrue as Defendant in this suit. *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. Later proceedings should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be disregarded.").

April 14, 2010 denying disability benefits. [R. 31-46].  On July 29, 2011, the Appeals Council denied Plaintiff's request for review [R. 1-3], making the making the Commissioner's decision final and a proper subject of this court's judicial review.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

### A.    Plaintiff's Hearing Testimony

Plaintiff was 29 years old at the time of the hearing. [R. 8].  Plaintiff had a high school education and had completed two years of college. [R. 8].  Plaintiff alleged he could not work due to chronic vomiting. [R. 8-9].  Plaintiff answered questions from his attorney about changes in his weight, which had fluctuated from 240 pounds to 139 pounds. [R. 9].  Plaintiff testified that he vomited between eight and fifteen times a day. [R. 10].  Plaintiff stated that he typically would vomit after eating or drinking. [R. 10-11].  According to Plaintiff, he gets dizzy after he vomits and he has to lie down for 20 to 30 minutes afterward. [R. 11].  Plaintiff stated that he had tried numerous medications to treat his vomiting. [R. 11].  He had visited the Mayo Clinic three times and was currently receiving treatment at Vanderbilt University Medical Center. [R. 11-12].  Although he would suffer from "a little stomach discomfort," Plaintiff denied other pain associated with his vomiting. [ R. 12].  Plaintiff stated that he was trying to eat four meals a day in an effort to gain weight. [R. 12].  Plaintiff testified that he would experience dehydration as a result of his vomiting and received fluids about every three to six months. [R. 13].  Plaintiff further testified that he has trouble sleeping due to his medication. [R. 13].  Plaintiff also stated that his medication causes dizziness and some light headaches. [R. 13].

Plaintiff had last worked as a dispatcher at the sheriff's office. [R. 14].  He testified that he quit due to his vomiting because he was "missing too many days" of work. [R. 14].  Plaintiff's chronic vomiting had troubled him for the past eight years and he believed he could not work

because he would miss too many days at any job and would not "feel that [he] would be a good employee right now. . . ." [R. 14-15].

On a typical day, Plaintiff testified that he would start his medication as soon as he woke up. [R. 15]. Depending upon how he felt, Plaintiff might watch television or have lunch with his wife. [R. 15]. Plaintiff stated that two or three days a week he is too sick to do anything other than sit on the couch or lie in bed all day. [R. 15]. Plaintiff drives but not often. [R. 16]. He does not shop alone in case he gets sick. [R. 16]. Plaintiff tries to go to church each Sunday if he is "feeling up to it." [R. 16]. He does some household chores like dusting and vacuuming. [R. 16].

### B.    Vocational Expert Hearing Testimony

A vocational expert ("VE") testified that Plaintiff's past relevant work includes police dispatcher, cashier checker, and video rental clerk. [R. 18-19]. In response to a hypothetical from the ALJ limiting a person of Plaintiff's age, education, and work experience to sedentary work, the VE testified that Plaintiff could perform his past work as a police dispatcher. [R. 19-20]. If the residual functional capacity moved from sedentary to light work, the VE testified that Plaintiff could perform all of his past work activity. [R. 20]. The VE further testified that if Plaintiff had to miss two days of work per month that restriction would preclude all work activity. [R. 20]. The VE also testified that if Plaintiff, due to his nausea, vomiting, and other gastrointestinal problems, had to take unscheduled work breaks beyond those typically scheduled for light work, these limitations would preclude all work activity. [R. 20].

### C.    Medical Records

Plaintiff submitted numerous medical records in support of his claims. Since 2002, Plaintiff has sought treatment from over a dozens physicians for his chronic vomiting. The earliest medical

records related to Plaintiff's condition reveal that in August and September 2002, he was experiencing abdominal pain, nausea, vomiting, and weight loss. [R. 229, 230, 231]. Dr. David Landry, M.D.'s treatment notes from this time indicate that there was no evidence of crohn's disease or any other abnormality. [R. 229]. A September 25, 2002 endoscopy revealed that Plaintiff had a medium sized hiatal hernia. [R. 226]. Dr. Landry opined that he suspected Plaintiff's condition may be neurogenic. [R. 226]. Treatment notes from a January 24, 2003 visit indicate that Dr. Landry believed Plaintiff's nausea and vomiting was psychogenic but he could not explain why the problem had started nine months before or why it continued. [R. 207]. Dr. Landry noted that he had not found a gastro-intestinal source for Plaintiff's condition. [R. 207].

On March 26, 2003, Plaintiff reported to the Mayo Clinic in Jacksonville, Florida for a consultation with Dr. Pedro Malavet, M.D. [R. 191]. Dr. Malavet's examination notes indicate that Plaintiff had seen his local physicians and undergone numerous tests, none of which revealed a specific cause for his persistent nausea. [R. 191]. Dr. Malavet diagnosed Plaintiff with persistent nausea and vomiting without significant evidence to indicate a structural abnormality. [R. 193]. Dr. Malavet also noted that Plaintiff showed no signs or symptoms suggesting persistent anxiety. However, in the absence of other abnormalities, Dr. Malavet could not rule out some form of anxiety disorder or psychiatric condition as a possible cause for Plaintiff's persistent vomiting. [R. 193].

At Dr. Malavet's request, Plaintiff saw Dr. Kenneth DeVault, M.D., at the Mayo Clinic on April 2, 2003. [R. 185]. Plaintiff reported that he was vomiting up to 16 times a day, sometimes after meals but also in the mornings before he had eaten. [R. 185]. Dr. DeVault reviewed Dr. Malavet's notes and Plaintiff's outside medical records. He noted that "nothing in particular has come up." [R. 186]. Dr. DeVault noted that Plaintiff's lab tests had been "universally normal." [R.

4

186].  According to Dr. DeVault, the "large number of negative tests " pointed toward a "functional etiology" for Plaintiff's nausea and vomiting. [R. 186].

On May 22, 2003, Dr. DeVault referred Plaintiff to Dr. Siong Chi Lin, M.D., for an assessment of Plaintiff's psychiatric status. [R. 183].  Dr. Lin diagnosed Plaintiff with persistent nausea and vomiting without clear organic etiology. [R. 184].  Although Plaintiff did not exhibit "overt anxiety symptoms," Dr. Lin opined that Xanax may provide some benefit. [R. 184].  Plaintiff was also prescribed Celexa. [R. 184].  Dr. Lin discussed the possible benefits of acupuncture with Plaintiff. [R. 184].

Plaintiff saw Dr. Landry again on November 4, 2003, and reported that Dr. DeVault had told him there were some chemical problems with his vagus nerve, and he felt it would resolve on its own over a period of time. [R. 214].  Examination notes indicate that Plaintiff had "been very active and ha[d] ben working" and was due for a promotion.  [R. 214].  Dr. Landry diagnosed Plaintiff with probable psychogenic nausea and vomiting.  He provided refills for Zelnorm, Xanax, and Nexium. [R. 214].

On February 17, 2004, Dr. Landry's treatment notes state that Plaintiff had been evaluated extensively for nausea and vomiting. [R. 216].  Plaintiff reported that he two viral illnesses since his last visit on November 4, 2003 and had been admitted to the hospital twice to receive IV fluids. [R. 216].  Plaintiff's weight had dropped from 205 in August 2002 to 186 during this November visit. [R. 216].  Dr. Landry's diagnosis included unexplained but probable psychogenic nausea and vomiting. [R. 216].  A February 26, 2004 colonoscopy revealed no pathologic diagnosis (no evidence of inflammation). [R. 213].

On September 28, 2004, Plaintiff reported that had "an excellent result with Asacol but [was] still vomiting two to three times a day on bad days." [R. 210].  Plaintiff had lost approximately 20 pounds over the past two years and indicated he was still experiencing abdominal pain. [R. 210].  Dr. Landry diagnosed Plaintiff with questionable atypical crohn's disease. [R. 210].

On October 23, 2004, results of a capsule endoscopy indicated that Plaintiff's small bowel was essentially normal. [R. 209].  The test did reveal that Plaintiff had a "single, diminutive proximal jejunal erosion," which was likely due to intestinal or incidental ingestion of aspirin or other anti-inflammatory medication. [R. 209].  No enteroscopic evidence of crohn's disease was present; therefore, treatment with crohn's specific medications was not recommended.  [R. 209].

On December 16, 2004, Plaintiff saw Dr. Stephen Suggs, M.D. for an evaluation of his chronic nausea and vomiting. [R. 264].  Plaintiff reported that he had experienced nausea and vomiting after eating. [R. 264].  Dr. Suggs noted that Plaintiff's extensive evaluations had revealed no particular cause for his condition. [R. 264].  Dr. Suggs also commented that Plaintiff's two MRI scans of the brain revealed no abnormalities. [R. 264].  Plaintiff's motor strength was 5/5 throughout and his sensory examination was normal. [R. 264].  His reflexes and gait were also normal. [R. 264].  Dr. Suggs doubted that Plaintiff's vomiting was neurologic. [R. 265].  Because his episodes were so directly related to eating, Dr. Suggs suspected they were gastrointestinal. [R. 265]. Dr. Suggs prescribed Depakote and instructed Plaintiff to follow up in two months. [R. 265].

Plaintiff saw Dr. DeVault at the Mayo Clinic again on March 14, 2005. [R. 251].  Plaintiff continued to complain of nausea and vomiting. [R. 251].  Despite considerable fatigue, Plaintiff continued to work. [R. 251].  Plaintiff's weight continued to fluctuate and he stated that he vomited after most meals. [R. 251].  Plaintiff had no new symptoms. [R. 251].  Dr. DeVault diagnosed

Plaintiff with nausea and vomiting.  The source was unclear but Dr. DeVault opined it was most likely functional. [R. 252].  Dr. DeVault also discussed the benefits of acupuncture.

Plaintiff reported to Dr. Charles Cloutier, M.D., on May 11, 2005. [R. 243].  Dr. Cloutier noted that numerous local physicians and those at the Mayo Clinic could not find a reason for Plaintiff's nausea and vomiting after meals. [R. 243].  Dr. Cloutier suggested that Plaintiff could be suffering from a functional bowel disorder. [R. 243].  Because Plaintiff "ha[d] been throwing up so long," Dr. Cloutier feared it was a "learned process" and that when Plaintiff "eats he know[s] he is going to throw up and it happens." [R. 243].  Dr. Cloutier suggested that Plaintiff should be taught bio-feed back mechanisms to avoid vomiting. [R. 243].  He opined that Plaintiff could have spastic colon, vagus nerve, or an automatic nervous system disorder over which he had no control. [R. 243].

Plaintiff saw Dr. Cloutier again on July 6, 2005 and reported that he had lost 10 to 13 pounds and continued to vomit after meals. [R. 240].  Extensive testing had revealed no physical cause for Plaintiff's condition. [R. 240].  Dr. Cloutier's treatment notes indicated that Plaintiff "like[d] his work" and that while he was busy, he experienced no nausea or vomiting. [R. 240].  According to Dr. Cloutier, Plaintiff's vomiting could be caused by a stress related disorder. [R. 240].  Plaintiff was started on Paxil instead of Lexapro.  Dr. Cloutier also prescribed Bentyl instead of Donnatal. [R. 240].

On October 10, 2005, Plaintiff saw Dr. A. Joseph Alexander, M.D., for an evaluation of his persistent vomiting and weight loss. [R. 290].  Dr. Alexander found no neurological deficits and diagnosed Plaintiff with weight loss and vomiting. [R. 291].  He recommended an esophagogastroduodenoscopy, which was performed on October 11, 2005. [R. 288].  It revealed some erosion in the lower third of the esophagus and a diffuse area of moderately sever gastritis in

7

the body of the stomach. [R. 288].  A repeat esophagogastroduodenoscopy revealed mild gastritis and areas of erosion.  Antral biopsy results revealed chronic mild gastritis. [R. 280-281].

On June 12, 2006, Dr. Alexander wrote a letter explaining that Plaintiff had been under his care since October 2005 after seeing multiple physicians for abdominal pain, nausea, and vomiting. [R. 272].  The letter explains that Plaintiff received successful treatment for Helicobacter pylori infection but continued to have vomiting. [R. 272].  Multiple endoscopies, gastric emptying studies, and small bowel x-rays were all unremarkable. [R. 272].  Currently, Plaintiff was symptomatically controlled with Protonix and/or Nexium. [R. 272].  Dr. Alexander opined that Plaintiff was "able to work in any kind of occupation." [R. 272].  However, according to Dr. Alexander, it would be inconvenient for him for to work any shift other than a regular day shift because of the possibility of him being exposed to too much stress at other times. [R. 272].

Plaintiff saw Dr. Suggs again on July 11, 2006 and reported that he continued to experience nausea and vomiting. [R. 263].  Plaintiff told Dr. Suggs the Depakote "did not help much." [R. 263].  Dr. Suggs recommended another MRI scan of the brain to rule out any demyelinating change. [R. 263].

On August 10, 2006, Plaintiff reported to the Decatur General Hospital Emergency Room with complaints of abdominal pain and right flank pain, which he described as being aching and cramping and medium in severity. [R. 409]  A CT scan of Plaintiff's pelvis and abdomen revealed no evidence of acute disease.  Plaintiff was diagnosed with abdominal pain, nausea, vomiting, and dehydration. [R. 409].

Plaintiff was seen by Dr. Orlyn Lockard, M.D., on September 5, 2006 for a consultative examination. [R. 269-270].  Plaintiff reported he had experienced right-sided sharp pain for four days

that got "somewhat worse after eating." [R. 269].  Plaintiff's current medications included Nexuim, Lexapro, and Ambien. [R. 269].  Dr. Lockard recommended a colonoscopy. [R. 270].  An

Plaintiff reported to the emergency room at Parkway Medical Center on September 18, 2006 complaining of abdominal pain and vomiting. [R. 316].  X-rays of the abdomen were within normal limits.  Plaintiff was diagnosed with abdominal pain and was treated with Morphine and Phenergan. [R. 316].

Plaintiff saw Dr. Alexandria Gutierrez, M.D., at the University of Alabama Hospital-Birmingham ("UAB") on September 28, 2006 for an evaluation of a four to five year history of chronic nausea and vomiting. [R. 366].  Deferential diagnoses, given his age and history, included inflammatory bowel disease and gastroparesis. [R. 367].  When Plaintiff returned on October 26, 2006, he stated that he was continuing to vomit after eating. [R. 367].  Dr. Gutierrez was unsure of the source of Plaintiff's nausea and vomiting; but, she was reassured that the source was not coming from an intrinsic gastrointestinal problem given the number of endoscopies and colonoscopies that Plaintiff had in addition to testing done during the visit. [R. 365].  Dr. Gutierrez believed Plaintiff's vomiting was possibly caused by a neural transmitter defect. [R. 365].  Dr. Gutierrez prescribed Amitriptyline for inclusion in Plaintiff's current medication regime.  [R. 365].

Plaintiff saw Dr. Gutierrez again on March 1, 2007. [R. 362].  Dr. Gutierrez noted that on his initial visit, Plaintiff reported vomiting more than 25 times a day and now only had five to six episodes a day after the recent doses of Amitriptyline. [R. 362].  Plaintiff told Dr. Gutierrez that "some days are better and sometimes they are worse" but that overall he was "doing much better." [R. 362].  On June 12, 2007, Plaintiff was admitted to the hospital overnight. [R. 356].  An MRI of his cervical spine and of his brain were both normal. [R. 356].  He was discharged with diagnoses

of chronic nausea and vomiting, dehydration, and migraine headaches. [R. 356]. Plaintiff underwent an upper endoscopy on June 29, 2007 that revealed no abnormalities and only mild esophagitis. [R. 355].

Dr. Gutierrez examined Plaintiff again on August 14, 2007. [R. 352]. Treatment notes indicate that although Plaintiff initially responded well to Amitriptyline, he had recently lost response. [R. 352]. Plaintiff reported that he was "quite unhappy with his quality of life secondary to the nausea and vomiting." [R. 352]. Dr. Gutierrez suggested that Plaintiff begin around-the-clock Phenegran or Compazine. [R. 352].

Plaintiff saw Christopher Bloom, Psy. D., on September 19, 2007. [R. 337]. Plaintiff was seeking help for his chronic vomiting. He told Dr. Bloom that his physicians had recommended he see a psychiatrist before but he never followed up. [R. 337]. During the visit, Plaintiff told Dr. Bloom he "felt hopeless" about his condition and thought it would "never go away." [R. 337]. Plaintiff demonstrated no signs of psychosis, mania, delusion, or ADHD. [R. 339]. Plaintiff continued to see Dr. Bloom for individual sessions every two weeks over the next two months. [R. 335-336]. Dr. Bloom provided behavior therapy. During the October 4, 2007 session, Plaintiff reported that had undergone a gastrointestinal work-up at UAB. He reported having moderate feelings of guilt but denied suicidal ideations. [R. 336]. On December 5, 2007, Plaintiff told Dr. Bloom he had "gotten worse." [R. 335]. Plaintiff acknowledged having a history of anxiety symptoms that were related to food, with hot flashes, heart pounding, dizziness, and light headedness. [R. 335]. On December 19, 2007, Dr. Bloom instructed Plaintiff to see his gastrointestinal doctor for further evaluation. [R. 335].

During his therapy with Dr. Bloom, Plaintiff returned to the emergency room at Parkway Medical Center on November 7, 2007. [R. 298]. Plaintiff complained of vomiting ten times in the past hour. [R. 298]. Plaintiff received IV medication and was diagnosed with cyclic emesis. [R. 300].

Dr. Gutierrez examined Plaintiff again on December 20, 2007. [R. 351]. Plaintiff reported that he was currently vomiting 15 to 20 times a day. [R. 351]. He was attempting to eat six times a day in an effort to maintain his current weight, which was 155 pounds. [R. 351]. Dr. Gutierrez noted Plaintiff's negative MRIs and his recent endoscopy, which revealed only mild esophagitis. [R. 351]. Dr. Gutierrez prescribed Compazine spansules and suppositories. [R. 351]. If these were not successful in relieving his symptoms, Dr. Gutierrez suggested that Plaintiff try Zofran. [R. 351]. At this time, Dr. Gutierrez indicated there was no need for follow up. [R. 351].

On March 31, 2008, Plaintiff saw Dr. Khurshid Yousuf, M.D., for an esophagogastroduodenoscopy. [R. 399]. The procedure revealed a normal esophogus, mild gastritis, and a normal duodenum. [R. 399]. Plaintiff was started on an anti-reflux diet and instructed to continue his current medications. [R. 399].

Dr. L. Randolph Buckner, M.D., performed a laparoscopic cholecystectomy on April 30, 2008 to treat Plaintiff's chronic cholecystitis. [R. 406]. The surgical pathology report revealed chronic cholecystitis with edema and muscosal erosion. No evidence of malignancy was identified. [R. 406]. When Plaintiff followed up on May 7, 2008, he reported that his vomiting had improved since the cholecystectomy and his appetite and activity were returning toward normal. [R. 428].

Dr. Mahipal Ravipati, M.D., examined Plaintiff on June 16, 2008. [R. 433-436].  Current medications included Nexium, Potassium, Lexapro, Ambien, and Benefiber. Upon examination, Plaintiff's abdomen was soft and non-tender.  His diagnosis included chronic vomiting. [R. 436].

Plaintiff saw Dr. Yousuf again on June 19, 2008 and complained of persistent nausea and vomiting. [R. 439].  Plaintiff was still having abdominal pain in the epigastric region but it had improved. [R. 439].   Plaintiff's appetite was reported as "good" and he had not lost any weight. [R. 439]. Plaintiff was diagnosed with persistent nausea and vomiting, GERD, and abdominal pain. [R. 439]. Plaintiff was instructed to continue Nexium.  Dr. Yousuf also prescribed Antivert. [R. 439].

Plaintiff reported to the Parkway Medical Center emergency room on July 14, 2008 complaining of nausea and vomiting.  Plaintiff was able to ambulate independently and perform all activities of daily living without assistance.  Doctors treated him with IV Phenergan and other fluids. At discharge, Plaintiff reported he was feeling better.  His diagnosis was vomiting. [R. 454].

Plaintiff saw Dr. Yousuf again on July 17, 2008, and continued to complain of nausea and vomiting despite taking Nexium and other prescribed medications. [R. 471].  Plaintiff reported that his nausea and vomiting were persistent no matter what he ate, when he ate, or how much he ate. [R. 471].  Dr. Yousuf took Plaintiff off Nexium and prescribed Aciphex.  He was also instructed to eat small meals and allow ample time for digestion before eating again. [R. 471].

Barry Wood, Ph.D. performed a consultative mental examination on August 27, 2008. [R. 499-502].  Dr. Wood diagnosed Plaintiff with depressive disorder with anxiety (in partial remission with medication). [R. 502].  Dr. Wood noted Plaintiff's Global Assessment of Function (GAF) score was 68.  Dr. Wood opined that Plaintiff could function independently, understand instructions, recall instructions, and execute instructions to the extent allowed by his physical status.  According to Dr.

12

Wood, Plaintiff's persistent low-level anxiety affects but does not preclude his ability to attend tasks for at least 2 consecutive hours. [R. 501]. Dr. Wood further noted that Plaintiff's execution of social skills during his examination demonstrated his ability to interact with customers, coworkers, and supervisors to a reasonable degree. [R. 501].

On September 15, 2008, Plaintiff saw Dr. Kirk Jackson, M.D., and requested a referral to a doctor at Vanderbilt University. Dr. Kirk diagnosed Plaintiff with chronic nausea and vomiting, GERD, and insomnia. [R. 549-550]. On October 3, 2008, Plaintiff saw Dr. Augustin B. Attwell, M.D., a Professor of Medicine at Vanderbilt University Medical Center. [R. 533]. Dr. Attwell commented that Plaintiff was "thin" but appeared well and in no acute distress. [R. 533]. Dr. Attwell diagnosed Plaintiff with recurrent nausea and vomiting that was likely functional. [R. 533]. However, Dr. Attwell could not rule out idiopathic gastoparesis. [R. 533]. He recommended a repeat gastric emptying studying and another EGD. [R. 533]. Dr. Attwell instructed Plaintiff to maintain a gastroparesis diet with small, frequent, lowfat meals. [R. 533]. A gastric emptying examination was completed on October 13, 2008. [R. 547]. Although the test was non-diagnostic because Plaintiff vomited twice during the examination, complete gastric obstruction was ruled out. [R. 547].

On October 17, 2008, Plaintiff was admitted to Vanderbilt University Medical Center. [R. 543]. His chief complaint was vomiting. Plaintiff reported that he had been unable to keep food down for 3 days. [R. 543]. Plaintiff was found to be hypokalemic. He was diagnosed with cyclic vomiting with hypoK, hypo C1, and alkalosis. [R. 543]. He was discharged on October 18, 2008 with diagnoses of recurrent nausea/vomiting of unclear etiology. He was instructed to continue taking Lexapro. [R. 538]. Overnight before discharge, Plaintiff was asymptomatic. He had no vomiting after his admission to the hospital. [R. 539].

Dr. Christopher Lind, M.D., a Professor of Medicine at Vanderbilt University Medical Center, examined Plaintiff on March 24, 2009. [R. 553]. Dr. Lind noted Plaintiff's long history of recurrent nausea and vomiting and commented that he believed it was partially related to upper GI tract spasm. [R. 553]. Plaintiff had been on antispasmodic therapy with improvement in his symptoms. [R. 553]. Plaintiff reported that he had done fairly well since his visit two months before and told Dr. Lind that he was "able to keep his food down better as compared to previously." [R. 553]. Plaintiff was still vomiting daily. [R. 553]. Dr. Lind diagnosed Plaintiff with recurrent vomiting related to recurrent upper GI tract spasm and associated GERD. [R. 553]. Plaintiff was doing well on his current treatment regime. [R. 553].

During a May 12, 2009 visit, Dr. Lind indicated that Plaintiff was vomiting daily but was able to keep meals down for three to six hours before vomiting. [R. 575]. According to Plaintiff, his vomiting was most prominent in the evenings. He reported minimal nausea and very mild abdominal pain prior to vomiting. [R. 575]. Plaintiff's diagnosis was recurrent nausea and vomiting. Dr. Lind opined that Plaintiff was doing well on his current treatment regimen. [R. 575].

Plaintiff saw Dr. Lind again on October 6, 2009 and January 5, 2010. [R. 576, 577]. During both examinations, Plaintiff reported that he was able to keep food down longer and he was gaining weight. [R. 576, 577]. Dr. Lind noted that Plaintiff continued to suffer from recurrent nausea and vomiting but indicated that he was improving on his current therapy. [R. 576, 577].

On January 28, 2010, Plaintiff was seen in the emergency room at Parkway Medical Center. He reported that he had a condition called "spastic stomach" and that he usually would vomit after eating. [R. 591]. Plaintiff stated that he had been vomiting more than normal earlier that day. [R.

14

591].  Plaintiff was treated with various medications and he was diagnosed with gastritis and mild

dehydration. [R. 591-592].

## II.    ALJ Decision

Disability under the Act is determined under a five-step test.  20 C.F.R. § 404.1520.  First,

the ALJ must determine whether the claimant is engaging in substantial gainful activity.  20 C.F.R.

§ 404.1520(a)(4)(i).  "Substantial work activity" is work activity that involves doing significant

physical or mental activities.  20 C.F.R. § 404.1572(a).  "Gainful work activity" is work that is done

for pay or profit.  20 C.F.R. § 404.1572(b).  If the ALJ finds that the claimant engages in substantial

gainful activity, then the claimant cannot claim disability.  20 C.F.R. § 404.1520(b).  Second, the

ALJ  must  determine  whether  the  claimant  has  a  medically  determinable  impairment  or  a

combination of medical impairments that significantly limits the claimant's ability to perform basic

work  activities.  20 C.F.R. § 404.1520(a)(4)(ii).  Absent such impairment, the claimant may not

claim disability.  (*Id.*).  Third, the ALJ must determine whether the claimant's impairment meets or

medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  *See*

20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526.  If such criteria are met, the claimant is declared

disabled.  20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the

third step, the ALJ may still find disability under the next two steps of the analysis.  The ALJ must

first determine the claimant's residual functional capacity ("RFC"), which refers to the claimant's

ability to work despite her impairments.  20 C.F.R. § 404.1520(e).  In the fourth step, the ALJ

determines  whether  the  claimant  has  the  RFC  to  perform  past  relevant  work.  20  C.F.R.  §

404.1520(a)(4)(iv).  If the claimant is determined to be capable of performing past relevant work,

then the claimant is deemed not disabled. (*Id.*). If the ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the fifth and final step. 20 C.F.R. § 404.1520(a)(4)(v). In the last part of the analysis, the ALJ must determine whether the claimant is able to perform any other work commensurate with her RFC, age, education, and work experience. 20 C.F.R. § 404.1520(g). Here, the burden of proof shifts from the claimant to the ALJ to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given her RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

In the instant case, the ALJ found that Plaintiff has not engaged in substantial gainful activity since June 1, 2006, the alleged onset date. [R. 33]. The ALJ determined that Plaintiff has gastroesophageal reflux disease, which is a severe impairment. [R. 33]. The ALJ also concluded that Plaintiff has depressive disorder with anxiety, which is a non-severe impairment.[2] [R. 33]. The ALJ then found that Plaintiff's impairment or combination of impairments does not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. [R. 43]. After consideration of the entire record, the ALJ concluded that Plaintff had the RFC to perform sedentary work as defined in 20 C.F.R.§§ 404.1567(a) and 416.967(a) with the following restrictions: Plaintiff should never climb ladders, ropes, or scaffolding; Plaintiff should never work at unprotected heights or be around concentrated exposure to extremes of cold, heat, dust, fumes, and gases. [R. 43]. The ALJ then determined that Plaintiff is capable of performing his past relevant work as a police dispatcher because this work does not require the performance of work related activities precluded

---

[2] The ALJ noted that although the record indicates a diagnosis of depressive disorder with anxiety, at the hearing, Plaintiff, through his attorney, stated that his depression was under control and that he had no work-related restrictions due to any psychological disorder. [R. 34].

by Plaintiff's RFC. [R. 45].  Accordingly, the ALJ concluded that Plaintiff is not disabled, as that term is defined in the Act. [R. 46].

## III.    Plaintiff's Argument for Reversal

Plaintiff seeks to have the Commissioner's decision reversed, or in the alternative, remanded for further proceedings. [Pl.'s Mem. 12].  Plaintiff contends that the ALJ's decision is not supported by substantial evidence and that improper legal standards were applied because: (1) the ALJ failed to properly evaluate the medical evidence of record and (2) the ALJ failed to properly develop the record. [Pl.'s Mem. 8-12].

## IV.    Standard of Review

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied.  *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).   Title 42 U.S.C. §§ 405(g) and 1383(c)(3) mandate that the Commissioner's findings are conclusive if supported by "substantial evidence."  *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence.  *See id.*  (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations

omitted).  If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings.  *See Martin*, 894 F.2d at 1529.  While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance."  *Lamb*, 847 F.2d at 701.

V.     **Discussion**

    A.     **The ALJ Properly Evaluated the Medical Evidence**

Plaintiff's first argument is that the ALJ failed to properly consider evidence of record establishing a disabling impairment. [Pl.'s Mem. 9].  The court disagrees.

The Supreme Court has held that "Social Security proceedings are inquisitorial rather than adversarial" and that the ALJ has the duty "to investigate the facts and develop arguments both for and against granting benefits."  *Sims v. Apfel*, 530 U.S. 103 (2000).  However, as explained by the Eleventh Circuit, "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision...is not a broad rejection which is 'not enough to enable [the district court] to conclude that the [ALJ] considered [his] medical condition as whole.'"  *Dyer v. Barnhart*, 395 F. 3d 1206, 1211 (11th Cir. 2005) (quoting *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995)).

In support of her argument, Plaintiff cites several Eleventh Circuit opinions, all of which are readily distinguishable.  Plaintiff relies upon *Cowart v. Schweiker*, 662 F.2d 731 (11th Cir. 1981) for the proposition that the ALJ must "scrupulously and conscientiously" probe into and explore all relevant facts. [Pl.'s Mem. 9].  *Cowart* is distinguishable from the this case for two separate and independent reasons.  First, *Cowart* concerned a claimant who had not waived representation by an

18

attorney, under which circumstances, the Eleventh Circuit held the ALJ had a special duty to develop the record. *Cowart*, 662 F.2d at 736.   Here, Plaintiff was represented by an attorney throughout the proceedings and at the hearing, and no special duty was triggered.   Second, this statement was made in the context of a discussion of the ALJ's obligation "to develop a full and fair record" at the hearing. *See id.*   Thus, it is not directly relevant to Plaintiff's argument that the ALJ did not properly evaluate the medical evidence in reaching his decision.

Plaintiff cites *Smith v. Schweiker*, 677 F.2d 826, 829 (11 th Cir. 1982)  for the proposition that the ALJ must fully and fairly develop record. [Pl.'s Mem. 7].   However, as in *Cowart*, the discussion of this duty arose in the context of a claimant who was unrepresented at the hearing and thus, the ALJ had a heightened duty to "scrupulously and conscientiously" explore all relevant facts. *Id.*   Again, Plaintiff was represented by counsel at the hearing in this case.   Thus, *Smith* is inapposite.

Plaintiff also cites *Nelms v. Bowen*, 803 F.2d 1164, 1165 (11th Cir. 1986).   In that case, the Eleventh Circuit held that where the record lacked evidence of the exertional requirements of the claimant's past relevant work, the ALJ was not supported in his determination that she could perform that work on the basis of an RFC for light work. *Id.*   However, here, the obtained VE testimony regarding the exertional demands of Plaintiff's past relevant work as a police dispatcher (which was classified as sedentary) and the ALJ's RFC determination was for sedentary work. [R. 18, 43]. Thus, *Nelms* is of no avail to Plaintiff.

The ALJ thoroughly discussed and reviewed medical records from multiple treating physicians and specialists with whom Plaintiff consulted in an effort to ascertain the cause of his chronic nausea and vomiting. [R. 33-43].   The ALJ's recitation of these records goes on for 10 pages He noted that Plaintiff experienced weight loss and dehydration as a result of his chronic vomitting.

19

[R. 36-38].  He also discussed at length various medical tests, including normal MRIs and various GI procedures that found few to no abnormalities.

Although he claims the ALJ failed to properly evaluate the medical evidence of record, Plaintiff points to no specific piece of evidence that the ALJ failed to include in his analysis. Further, Plaintiff provides no detail regarding any evidence that the ALJ misstated or mischaracterized.  This court is convinced, based upon a review of the ALJ's decision, that he Plaintiff's sweeping conclusion that the ALJ failed to properly consider evidence establishing a disabling impairment simply is not supported by the record.  Therefore, the court finds the Commissioner's decision is not due to be reversed on this ground.

### B.       The ALJ Did Not Fail to Develop the Record

Plaintiff also asserts that the ALJ failed to properly develop the record.  Plaintiff maintains that instead of giving him "the benefit of the doubt" as to his RFC, the ALJ should have obtained a medical expert's opinion or a consultative examination in order to make an informed decision. [Pl.'s Mem. 10].  Contrary to Plaintiff's argument, the court concludes that the ALJ provided an RFC determination based upon substantial evidence and was under no duty to further develop the record before doing so.

"Even though Social Security courts are inquisitorial, not adversarial, in nature, claimants must establish that they are eligible for benefits.  The administrative law judge has a duty to develop the record where appropriate but is not required to order a consultative examination as long as the record contains sufficient evidence for the administrative law judge to make an informed decision." *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1269 (11th Cir. 2007).  Stated another way, "[t]he ALJ's duty to develop the record is triggered when there is ambiguous evidence or when the record

is inadequate to allow for a proper evaluation of the evidence." *Rivers v. Astrue*, 901 F. Supp. 2d 1317, 1326 (S.D. Ala. 2012); *see also* 20 C.F.R. § 404.1519a(b) ("We may purchase a consultative examination to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim."). Additionally, during the hearing process, a medical expert may provide an advisory assessment to determine whether an impairment could reasonably be expected to produce a claimant's alleged symptoms. *See* 20 C.F.R. § 404.1529(b) ("At the administrative law judge hearing or Appeals Council level of the administrative review process, the adjudicator(s) may ask for and consider the opinion of a medical or psychological expert concerning whether your impairment(s) could reasonably be expected to produce your alleged symptoms.").

In this case, Plaintiff's contention that the ALJ lacked sufficient evidence upon which to make an informed decision regarding Plaintiff's limitations is simply off the mark. First, the ALJ did develop the record by ordering a psychological consultative examination by Dr. Wood. The ALJ discussed Dr. Wood's findings and gave his opinion some weight in the overall determination. [R. 40, 45, 499-502]. Second, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. Thus, no medical expert opinion was required in accordance with 20 C.F.R. § 404.1529(b). The ALJ had sufficient evidence before him to accurately assess Plaintiff's impairments and provide an RFC determination. The ALJ also provided a thorough and detailed analysis of Plaintiff's medical treatment including his visits to numerous physicians for evaluation of his nausea and vomiting. Additionally, the ALJ discussed various medical tests that failed to identify any significant problems or causes of Plaintiff's condition. The ALJ commented that Plaintiff was hospitalized for five days at Vanderbilt without

any reported episodes of vomiting. [R. 44].  The ALJ further noted that the record was devoid of any opinions from any treating or examining physicians indicating that Plaintiff was disabled or even has limitations greater than those assessed in the RFC. [R. 45].  In fact, the only evidence of record suggesting any restriction on Plaintiff's ability to work is from Dr. Alexander.  And, it was Dr. Alexander's opinion that Plaintiff was "able to work in any kind of occupation" but that it may be inconvenient for him to work any shift other than a typical day shift due to the possibility of exposure to stress at other times. [R. 272].  Based upon the foregoing, the undersigned finds that the evidence before the ALJ was sufficient to allow him to render an informed decision.  The ALJ was not required to order another consultative examination or to obtain hearing testimony from a medical expert.  Accordingly, Plaintiff's claim that the ALJ failed to develop the record must fail.

## VI.    Conclusion

For the reasons stated above, the court concludes that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence and that proper legal standards were applied. Accordingly, the Commissioner's decision is due to be affirmed.  A separate order in accordance with this memorandum opinion will be entered.

**DONE** and **ORDERED** this ___26th___ day of September, 2013.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE